United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GREEN DESERT OIL GROUP, et al.,

    Plaintiffs,

v.

BP WEST COAST PRODUCTS, et al.,

    Defendants.

No. C 11-02087 CRB

**ORDER GRANTING MOTION TO DISMISS DEFENDANT RETALIX LTD**

This is a class action brought by BP gas station franchisees ("Plaintiffs") against BP[1] and software company Retalix Ltd. The Court held a hearing on October 11, 2011, at which it granted in part a Motion to Dismiss filed by BP (dkt. 33), and denied Plaintiffs' Motion for a Preliminary Injunction (dkt. 21). See Minutes (dkt. 57). The Court also heard argument at that hearing about a Motion to Dismiss filed by Retalix (dkt. 29), but did not rule on the Motion at that time, instead granting Plaintiffs' request to file supplemental briefing in opposition to the Motion. Id. Plaintiffs have now filed their supplemental brief (dkt. 61) and Retalix has filed a response (dkt. 62). The Court has carefully considered all of the parties' filings and arguments, and GRANTS Retalix's Motion for the reasons set forth below.

//

//

---

[1] Plaintiffs have sued BP West Coast Products LLC and BP Products North America, Inc., and refer to them collectively as BP.

## I. BACKGROUND

This case primarily involves allegations by Plaintiffs that BP has breached various agreements by forcing them to buy and use a defective computer system. FAC ¶¶ 45-55. The computer system, called Retalix, is a "centralized point of sale . . . system." Id. ¶ 31(i). Plaintiffs allege that the Retalix system is defective, resulting in "lost operation time, lost revenue, lost or inaccurate inventory, lost receivables and cash, and increased operating costs and burdens." Id.[2]

Plaintiffs initially filed suit in April 2011. See Compl. (dkt. 1). Following a June 2011 Motion to Dismiss (dkt. 14), Plaintiffs stipulated to file an amended complaint (dkt. 17). Plaintiffs filed the FAC (dkt. 20) in August 2011, followed shortly thereafter by a Motion for a Temporary Restraining Order (dkt. 21). The Court held a hearing on the Motion for a Temporary Restraining Order on August 18, 2011; it declined to order the requested relief, though it did not explicitly deny the Motion. See Minutes (dkt. 25). After the hearing, BP assured Plaintiffs that it would not terminate any franchisee for failing to pay for Retalix on less than 30 days' notice. See Plaintiff's Updated Submission (dkt. 36) at 2. Thereafter, Plaintiffs filed a Motion for Preliminary Injunction, BP filed a Motion to Dismiss, and Retalix filed its own Motion to Dismiss. Having already ruled on the Motion for Preliminary Injunction and BP's Motion to Dismiss, the Court will only address Retalix's Motion herein.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss a cause of action which fails to state a claim upon which relief can be granted. On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Wyler-Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998). To survive a Rule 12(b)(6) motion to dismiss, the complaint must state a claim to relief that is "plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). A claim

---

[2] Plaintiffs make numerous other allegations against BP that are not relevant to the current Motion.

2

has "facial plausibility" when the pleaded factual allegations "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

## III. DISCUSSION

The FAC includes three causes of action against Retalix: (1) breach of contract; (2) negligence; and (3) violation of the UCL. See FAC ¶¶ 80-98. Retalix asks the Court to dismiss all three causes of action, and also to strike the FAC's class allegations. See generally R Mot (dkt. 29). This last request is premature, see Thorpe v. Abbott Labs., Inc., 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008) ("Motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle for the arguments [defendant] advances herein"), but the first three are appropriate.[3]

### A. Breach of Contract

Plaintiffs's breach of contract claim against Retalix is explicitly labeled a "third party beneficiary" claim in the FAC. See FAC at 21. The FAC alleges that "Upon information and belief" there is a contract between Retalix and BP that "expressly or implicitly" required Retalix to manufacture and install a computer system that performs "reasonably and satisfactorily." Id. ¶¶ 88-89. It further alleges that the Retalix-BP agreement was made "expressly for the benefit of Plaintiffs." Id. ¶ 90. And it alleges that Retalix breached the agreement "by manufacturing and installing a defective computer system, harming Plaintiffs. Id. ¶¶ 91-92.[4] These allegations fail for the following three reasons.

#### 1. Third Party Beneficiaries

First, despite their conclusory allegation to the contrary, Plaintiffs are not third party beneficiaries under the contract. See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001) (court need not accept as true conclusory allegations). Further, that allegation is defeated by the language of the contract at issue (the Master Software License Agreement,

---

[3] Retalix also initially argued that the Court does not have personal jurisdiction over it, see R MTD at 4-6, but has apparently withdrawn that argument so that Plaintiffs can engage in jurisdictional discovery, Opp'n at 1 n.1.

[4] The Court notes that none of these allegations involve breach of the service provisions upon which Plaintiffs rely in opposing Retalix's Motion to Dismiss. See Supp. Br. (dkt. 61) at 6-7.

3

or "MSLA").[5] The MSLA specifically identifies its beneficiaries as BP, its Affiliates and its "Licensed Companies." MSLA (Zelichov Decl. Ex. A) ¶ 6.3.[6] The MSLA defines "Affiliates" as follows:

> The term "Affiliate" . . . , when used with respect to one of the parties hereto, shall mean a) the Parent Company thereof; b) any legal entity directly or indirectly controlled by, or under common control with that party . . . c) a firm, undertaking, joint venture, association, partnership, or other form of business organization in or through which the Parent Company directly or indirectly performs as designated operator or carries on business and in which it directly or indirectly has an ownership interest; or d) any entity in which a party owns less than fifty percent (50%) of the voting rights of such legal entity due to legal restrictions or government requirements in a country where such entity is organized or operates, over which the Party otherwise exercises control regarding management or operations of such legal entity, and the government of such country owns at least a majority of the remaining portion of such entity.

Id. ¶ 1.1. It defines "Licensed Companies" as any BP Affiliate, "any third party which provides outsourcing services to any BP Business Entity . . . or any third party which requires access to or use of facilities of any BP Business Entity to accomplish the purpose of such entity." Id. Finally, it defines Business Entity as "any BP Affiliate, or any business unit, division or department of BP or any BP Affiliate." Id.

Of course, Plaintiffs are not BP, and the FAC does not allege any facts suggesting that Plaintiffs are either Affiliates or Licensed Companies as defined in the MSLA. See also R Reply at 4 ("Plaintiffs did not respond to Retalix's argument that the BP Franchisees are not 'BP Affiliates' or BP 'Licensed Companies'"). Instead, Plaintiffs argue in their Opposition and argued at the motion hearing that they are intended, if unmentioned, beneficiaries of the MSLA. Opp'n at 5 ("The reasonable inference is that Defendants' contract was intended solely to benefit Plaintiffs as the Retalix system was intended to be installed at their respective stations"). The Court does not agree.

---

[5] Retalix argues that the Court may take judicial notice of the contract because it was described in and relied on in the Complaint. See R MTD at 3 n.3. Plaintiffs do not object to the Court's taking notice of the contract.

[6] The Court rejects Plaintiffs' argument at the motion hearing that the contract would have specifically stated – if indeed it was the contracting parties' intention – that franchisees are not third party beneficiaries. The parties might have had good reason not to draft the contract in such a manner, as doing so could invite any person or entity not so identified to claim to be a beneficiary.

4

1    Plaintiffs are correct that a contract clause limiting, or even barring, third party
2 beneficiaries is not dispositive. See Supp. Br. (dkt. 61) at 2 (citing Prouty v. Gores Tech.
3 Grp., 121 Cal. App. 4th 1225 (2004)). Nonetheless, "[a]lthough intended beneficiaries need
4 not be specifically or individually identified in the contract, they still must fall within a class
5 clearly intended by the parties to benefit from the contract." Marques v. Wells Fargo Home
6 Mortgage, Inc., No. 09-cv-1985, 2010 WL 3212131, at *3 (S.D. Cal. Aug. 12, 2010) (internal
7 citation and quotation marks omitted). Thus in Prouty, where a contract between two
8 companies included a specific provision granting rights to one company's employees that
9 "expressly benefit[ted] them, and only them," 121 Cal. App. 4th at 1233, the court found that
10 the specific provision was an exception to the contract's general "no third party
11 beneficiaries" provision, and the employees could enforce the contract as third party
12 beneficiaries, id. at 1235; see also Milmoe v. Gevity HR, Inc., No. 06-04721, 2006 WL
13 2691393, at *4 (N.D. Cal. Sept. 20, 2006) (court deferred ruling on whether other provisions
14 in contract were intended to benefit plaintiff notwithstanding a "no third party beneficiaries"
15 provision).

16    Here, in contrast to Prouty and to Milmoe, there is no express provision in the MSLA
17 intended to benefit Plaintiffs. The provisions Plaintiffs rely on benefit BP. For example,
18 Schedule B5, entitled "Service Level Agreement," identifies potential problems such as "the
19 flow of transactions between the POS and the Back Office [becoming] non-operational or
20 usable due to a software malfunction," and states that Retalix will "endeavour[] to try and
21 rectify the problem as soon as possible." See Supp. Br. at 6 (citing MSLA Schedule B5 §§
22 1biii, 1iii). Retalix points out that the process described in Schedule B5 does not begin until
23 second level service makes a request, see Supp. Resp. (dkt. 62) at 5 (citing MSLA Schedule
24 B5 § 1a), meaning that "Retalix is three levels away from the BP franchisees," and that the
25 first two levels of service are provided by some other entity, id. But the Court's problem
26 with Schedule B5 as a basis for Plaintiffs' third party beneficiary claim is even more basic: it
27 is BP who benefits from such service, because BP only gets paid when its franchises are
28 operating. Schedule B5 does not mention the franchisees, and the franchisees do not pay

5

1 Retalix for maintenance – BP does. See MSLA § 4.1 ("LICENSOR does not warrant that the
2 Licensed Software will operate error-free. . . . upon BP's payment of the Maintenance fees
3 due hereunder, LICENSOR shall provide Maintenance Services . . ."). The same is true of
4 Sections 4.1 and 5.2[7] of the MSLA.

5 Based upon "reading the contract as a whole in light of the circumstances under which
6 it was entered," see Prouty, 121 Cal. App. 4th at 1233, the Court concludes that while the
7 MSLA was clearly intended to <u>affect</u> the franchisees, the implementation of a computer
8 system to track money spent in BP franchises is not clearly intended to <u>benefit</u> franchisees,
9 but to benefit BP.[8]

### 2. All Demands to be Filed by BP

11 Second, even if Plaintiffs were third party beneficiaries of the MSLA, their breach of
12 contract claim would fail. The MSLA provides that "all demands by any BP Affiliate and or
13 any third party that shall receive the Licensed Software . . . shall be filed by BP on behalf of
14 the said BP Affiliate or the third party and may not be filed directly by any BP Affiliate
15 and/or the third party. BP will be responsible to enforce the provisions of this clause."
16 See MSLA § 6.3. Based on the plain language of the MSLA, therefore, <u>only BP can bring
17 claims against Retalix</u>; Plaintiffs do not have standing to sue it. Id.

18 Plaintiffs' arguments to the contrary are unavailing. They argue that they are not the
19 "third party" mentioned in paragraph 6.3 and so this restriction "does not include Plaintiffs."
20 Supp. Br. at 5 n.4. That does not makes sense: either they are third party beneficiaries under
21 the contract or they are not. Plaintiffs point to no authority stating that an implied third party
22 beneficiary is entitled to greater rights than an express third party beneficiary, or that the
23 distinction is legally meaningful in terms of such a provision. They also argue that "it would

---

[7] BP also argues compellingly that Section 5.2, "Conformance to Licensed Materials," "mentions BP (and not the franchisees) no less than nine times" – the Court counts ten – "making it absurd for Plaintiffs to argue that it was intended to benefit 'them and only them.'" See Supp. Resp. at 5.

[8] The Court further finds unpersuasive Plaintiffs' argument that they <u>might</u> be third party beneficiaries under the Professional Services Agreement ("PSA"), a contract not mentioned in the FAC and which Retalix represents <u>does not involve the licensing of Retalix software to BP</u>, which is the basis of Plaintiffs' claims. See Supp. Br. at 8-9, Supp. Resp. at 6-8.

6

1  be futile for Plaintiffs to ask BP to sue Retalix on Plaintiffs' behalf for defects with the
2  Retalix system," id., but they neither explain how demand futility is relevant in this context,
3  nor square their assertion of futility with their discussion elsewhere of BP's settlement offer,
4  which included an assignment of claims against Retalix, id. at 8.

### 3. Forum Selection Clause

Third, the MSLA provides that all disputes arising out of the contract and the legal relationship between BP and Retalix are to be governed by English law and shall be subject to the exclusive jurisdiction of English courts. MSLA § 6.10. Plaintiffs argue that the forum selection clause is unenforceable as violative of public policy.[9] Opp'n at 6 (citing Marques, 2010 WL 3212131, at *2). But their argument relies entirely on Jones v. GNC Franchising, Inc., 211 F.3d 495, 496 (9th Cir. 2000), a case in which a franchise agreement included a forum selection clause providing that any action by a franchisee be brought in Pennsylvania. In Jones, the Ninth Circuit upheld the district court's declination to enforce the forum selection clause because a section of the California Business and Professions Code specifically provided that "[a] provision in a franchise agreement restricting venue to a forum outside this state is void with respect to any claim arising under or relating to a franchise agreement." Id. at 497 (citing Cal. B&P C. § 20040.5). The court explained that a "provision . . . that requires a California franchisee to resolve claims related to the franchise agreement in a non-California court directly contravenes this strong public policy and is unenforceable." Id. at 498. The MSLA is not a franchise agreement, but a software licensing contract between Retalix and BP which does not even allow for a suit by third parties – § 20040.5 is inapplicable.

Plaintiffs have therefore not identified a public policy that enforcement of the forum selection clause would contravene. See also Manetti-Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509, 514 (9th Cir. 1988) ("Forum selection clauses are prima facie valid, and are enforceable absent a strong showing by the party opposing the clause 'that enforcement

---

[9] Plaintiffs' additional argument at the hearing that the forum selection clause is "very easily addressed" because "[w]e are not part of that agreement" is unconvincing. See Tr. (dkt. 59) at 15:11-12. If Plaintiffs are not part of the MSLA, then they cannot sue for its breach.

1 would be unreasonable or unjust, or that the clause [is] invalid for such reasons as fraud or
2 overreaching.'"). They have not made a strong showing that the forum selection clause is
3 invalid, and so the Court will enforce it.

4 The breach of contract claim against Retalix is therefore dismissed. Because the
5 forum selection clause applies to "any action . . . arising out of or related to this Agreement,"
6 MSLA § 6.10, it likely also applies to Plaintiffs' negligence and UCL claims as well as the
7 breach of contract claim. See Manetti-Farrow, Inc., 858 F.2d at 513-14 (forum selection
8 clause applies to tort claims as well where language so indicates). However, there are also
9 independent bases for dismissing the negligence and UCL causes of action.

### B. Negligence

11 Plaintiffs' negligence claim against Retalix asserts that Retalix "had a duty to ensure
12 that they adequately selected and supervised the design, testing, and implementation of the
13 [Retalix computer system] for all franchisees," and that Retalix breached its duty, causing
14 Plaintiffs foreseeable harm. FAC ¶¶ 81-84. There are several problems with such
15 allegations, but the most significant problem is the source of the duty alleged. Plaintiffs can
16 plead a duty only where there is (a) a duty imposed by law; (b) a duty assumed by the
17 defendant, or (c) a duty arising out of a preexisting relationship. See Benson v. Superior
18 Court, 185 Cal. App. 4th 1179, 1187 (2010). The FAC properly invokes none of these.

19 Instead, in their Opposition, Plaintiffs claim to have a "special relationship" with
20 Retalix, giving rise to a duty (and entitlement to recover for loss of expected economic
21 advantage) under J'Aire Corp. v. Gregory, 24 Cal. 3d 799, 804 (1979). Opp'n at 7-9. But
22 Plaintiffs did not plead the six J'Aire factors[10] in the FAC. See FAC ¶ 81(b) (conclusorily
23 alleging duty and not mentioning special relationship). Nor does the Court find that
24 Plaintiffs could amend in order to do so, particularly as to the second and fourth factors. As
25 to the foreseeability of harm to Plaintiffs, though Plaintiffs argue that Retalix "knew" that the

---

[10] These are: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to defendant's contact, and (6) the policy of preventing future harm.

8

Retalix software was intended for them, the MSLA grants BP a right to use the software in eighteen countries on five continents, MSLA § 1.2, and nowhere states that the software was intended for these Plaintiffs. As to the connection between Retalix's conduct and the injury suffered, Retalix argues that it provided just one component of a complicated system that Retalix did not even install. See Reply at 8 ("the system at issue included 11 different software programs developed by not less than six different developers together with 19 separate hardware items manufactured by as many as a dozen different entities"). Plaintiffs would be hard-pressed to plausibly allege that it was Retalix's component that caused Plaintiffs' harm. The negligence cause of action is therefore dismissed.

### C. Unfair Competition Law

The UCL claim against Retalix also fails to state a claim. It alleges first that "Plaintiffs are informed and believe, and based thereon allege that Defendants, and each of them have engaged in a pattern of behavior and/or a course of conduct unfair and/or fraudulent business practices against Plaintiffs within the meaning of . . . § 17200 et seq." FAC ¶ 94. It actually repeats that same allegation twice. See id. ¶95. The FAC next alleges that "Defendants, and each of them, negligently or knowingly and fraudulently misrepresented the (i) the [sic] efficacy of the Retalix system; (ii) the profitability of the franchises as a result of the various breaches alleged above; (iii) failure by the BP Defendants to spend all advertising and promotion fees." Id. ¶ 96. And it alleges that the Defendants' actions caused Plaintiffs actual injury, entitling them to damages. Id. ¶¶ 97-98.

The UCL claim thus fails to identify any particular unfair or fraudulent business practice other than three misrepresentations. See id. ¶¶ 94-96. Accordingly, it is grounded in fraud. See Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009) (describing misrepresentation as component of fraud claim). Because it is grounded in fraud, it must be pled with particularity under Federal Rule of Civil Procedure 9(b). Id. at 1127. Rule 9(b) "requires an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). The FAC provides none of

9

these specifics as to the misrepresentations at issue, and the Court is unconvinced that Plaintiffs could amend in order to adequately address this failing. Accordingly, the UCL claim is dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Retalix's Motion, with prejudice.

**IT IS SO ORDERED.**

Dated: November 14, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE